**UNITED STATES of America, Appellee,**

v.

**Mark REED, Defendant–Appellant.**

**No. 666, Docket 94–1180.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 11, 1995.

Decided March 10, 1995.

Joshua W. Nesbitt, Asst. U.S. Atty., Albany, NY (Thomas J. Maroney, U.S. Atty. for the N.D.N.Y., Albany, NY, on the brief), for appellee.

Colleen P. ·Cassidy, New York City (The Legal Aid Society, Federal Defender Div., Appeals Bureau, New York City, on the brief), for defendant-appellant.

Before KEARSE, McLAUGHLIN, and PARKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Mark Reed appeals from a judgment entered in the United States District Court for the Northern District of New York following his plea of guilty before Frederick J. Scullin, Jr., *Judge,* convicting him on one count of conspiracy to distribute and to possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988), and one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371 (1988) and 18 U.S.C. § 1341 (Supp. II 1990), and sentencing him principally to 144 months' imprisonment, to be followed by a four-year term of supervised release. On appeal, Reed challenges his sentence, contending principally that the court enhanced his offense level pursuant to § 3C1.1 of the federal Sentencing Guidelines ("Guidelines") for obstruction of justice, without making the requisite finding that his obstructive conduct was willful. For the reasons that follow, we agree and therefore vacate and remand for resentencing.

## I. BACKGROUND

In April 1993, pursuant to a plea bargain, Reed pleaded guilty to the above mail-fraud and narcotics-distribution conspiracy charges. He admitted to participating with the brothers Daniel and David Richburg in a scheme to have various recruited individuals cash fraudulent checks for them; the coconspirators compensated their recruits by supplying them with crack cocaine. The plea agreement noted that the narcotics count carried a 10–year minimum term of imprisonment and that the mail fraud count carried a 5–year maximum term. As part of the plea bargain, Reed agreed to cooperate by testifying against the Richburgs, and the government agreed to consider recommending a sentence reduction under Guidelines § 5K1.1 and/or Fed.R.Crim.P. 35(b) if Reed provided substantial assistance in the investigation or prosecution of a person who had committed an offense. In order to facilitate Reed's continuing cooperation, the government agreed to support a motion for his release on bail.

The plea agreement also stated the parties' understanding as to the proper calculation of Reed's Guidelines offense level, including a statement that, assuming Reed continued to satisfy the requirements of Guidelines § 3E1.1, his offense level would be reduced by three steps for acceptance of responsibility. Paragraph ¶ 4(A)(1)(d) of the plea agreement stated the parties' understanding that Guidelines "§ 3C, concerning 'obstruction', is not applicable *at this time*." (Emphasis in original.)

Reed was ordered released on bail on April 29, 1993, subject to certain conditions of release. In addition, because at the time of his arrest on the present charges he was on supervised release from a prior unrelated conviction, he remained subject to the conditions of his original supervised release. Among the conditions to which Reed was subject were requirements that he (a) not commit any further crimes, (b) not associate with persons engaged in criminal behavior, (c) maintain his residence at 379 8th Street in Troy, New York (the "Troy residence"), (d) keep monthly contact with his probation officer, and (e) keep daily contact with an agent of the Federal Bureau of Investigation ("FBI") with whom he was to cooperate. The April 29, 1993 order for Reed's release ("bail order") further provided, in pertinent part, that

> [t]he defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as directed. The defendant shall next appear *as so notified to appear.*

(Bail order (emphasis added).) At the April 26 plea hearing, the court had scheduled sentencing for July 23, 1993. The April 29 bail order, however, did not specify a date for Reed's further court appearance; rather the emphasized language quoted above was typed in on the line normally used on the bail release form to give precise notice of such a date.

Reed's sentencing date was twice postponed, first to October 22 and then to November 19. In the meantime, the Probation Office completed a presentence report ("PSR") recommending, *inter alia*, a three-step reduction for acceptance of responsibility. Reed cooperated in the prosecution of the Richburgs, and as a consequence, in a letter dated November 18, 1993, the government moved for a downward departure under Guidelines § 5K1.1. However, the government urged the court not to depart to any great extent, stating that Reed had returned to criminal behavior while on release and had not provided assistance in capturing other narcotics traffickers.

On November 19, Reed failed to appear for sentencing. The district court issued a bench warrant for his arrest. On December 15, 1993, Reed was arrested in Albany, New York, which is some eight miles from Troy, by local police and agents of the Drug Enforcement Administration ("DEA"). When the officers broke into the house in which Reed was located (the "Albany house"), Reed dove out of a window and ran for 1½ blocks before he was captured.

As a result of Reed's failure to appear for sentencing on November 19, the Probation Office submitted an amended PSR stating that the court, in its discretion, might therefore adjust Reed's offense level upward for

obstruction of justice and deny him credit for acceptance of responsibility. At Reed's eventual sentencing hearing, the government pressed for these results. Reed resisted, arguing, *inter alia*, that he had not been informed in advance of the November 19 sentencing date. He also stated that when the officers arrived to arrest him on December 15, he had believed they were criminals seeking to retaliate against him for cooperating with the authorities. An evidentiary hearing was held.

At the hearing, the government called various agents and officers to testify to Reed's failure to report as required during his period of release on bail. Probation officer Timothy Murphy testified that Reed was supposed to have reported to Murphy once a month following his April 29 release, and that Murphy had told Reed he could be flexible and coordinate his reporting with his visits to FBI agent Gregory Pack, with whom Reed was cooperating. Murphy stated that Reed had reported to him at least once a month through August 6, 1993. Thereafter, Reed did not report to Murphy, and Murphy kept only casual contact with Reed through Pack. In October, Murphy tried to contact Reed at the Troy residence and was informed by Reed's girlfriend that Reed had not been there for four months.

FBI agent Pack testified that although Reed was supposed to have maintained daily contact with the FBI he had not done so. Pack stated that he had spoken with Reed by telephone on several occasions and in person twice, and that Reed had ceased to maintain contact with Pack in July. Pack made several attempts to contact Reed through Reed's family and acquaintances but was unsuccessful.

DEA agent John Rice testified that he had had dealings with Reed following Reed's arrest in 1988 and that in June 1993, Reed contacted Rice and DEA agent Ulie Delgado to initiate cooperation with the DEA because of difficulties with the FBI. Reed offered to help in investigating and apprehending certain individuals whom the DEA suspected of involvement in narcotics trafficking. Rice and Delgado sought clearance from their supervisor to register Reed as an informant;

the supervisor approved, apparently after obtaining an "okay" from "the Bureau." (Sentencing Transcript dated March 24, 1994 ("March 24 Tr."), at 32.) From June until August, Reed maintained contact with the DEA agents by calling their beeper numbers once or twice a week. In August regular contact ceased, but Reed helped to set up the arrest of a drug courier in early September. The DEA agents thereafter had only occasional conversations with Reed, the last in a telephone call initiated by Reed after his November 19 failure to appear for sentencing. Rice testified that in this final conversation, agent Delgado told Reed that Reed "was in somewhat of a tight spot and the best thing for him to do would be to turn himself in." (*Id.* at 46.)

Rice also described Reed's arrest in December. Rice had received a tip that Reed was at the Albany house. The agents' plan was for Rice to telephone the house, hoping to have Reed answer so that Rice could verify his presence. Rice testified that "[s]imultaneous [with Rice's call, a team of other law enforcement agents] went in through the front door and was standing in the hallway. As they were hearing the phone ring, they heard movement inside the house. Upon that, I observed Mr. Reed exit the front window of the house and basically do a nose dive on the pavement." (*Id.* at 35.) Reed "fled by foot, and then he rounded, then he headed north about a block and a half before he was apprehended." (*Id.*) On cross-examination, Rice testified that he believed that the agents had knocked at the door before entering. When asked whether the officers had identified themselves as law enforcement officers, Rice answered, "Yes. As Mr. Reed hit the sidewalk, we started yelling police." (*Id.* at 43.)

Reed testified on his own behalf. He stated that he had contacted the DEA because he was comfortable with Rice from past dealings but was uncomfortable with Pack. Reed stated his understanding that the DEA agents obtained approval from their superiors for Reed to work with them instead of the FBI; he testified that the DEA agents told him to stop reporting to Pack. When the court asked why Reed had not appeared

for sentencing, Reed testified that his attorney

> was supposed to contact me like two weeks in advance to let me know, you know, which he did in a week's advance, but I was nowhere to be found....
>
> I didn't find out, your Honor, until like a week later my brother found me over in Albany, it was like you are in a lot of trouble and these people are looking for you.

(*Id.* at 86.) On questioning by the court, Reed testified similarly:

> THE COURT: It was your decision not to appear, for whatever reason, not to appear in court; right?
>
> THE WITNESS: At the time the date that was set for me to appear in court, I had no, I had no knowledge that I was supposed to be here.
>
> THE COURT: I advised you of that myself, when your sentencing date was.
>
> THE WITNESS: Yes, sir. No, no. One time I was supposed to show in court, and I was all geared up to go and Mr. Rice had called me and told me we got your sentencing adjourned, and everything.
>
> ....
>
> THE COURT: You weren't advised of the new date?
>
> THE WITNESS: No. I found out that I was supposed to be in court, was like a week later.

(*Id.* at 90.) Reed testified that after learning that he had missed his sentencing date, he decided to turn himself in right after Christmas.

Reed also testified that as a result of his cooperation with the government, the Richburgs had threatened him and had sent to Reed's home a man who fought with him and "tore the place up." (*Id.* at 85.) Reed testified that on December 15, therefore, when the officers broke into the Albany house and did not identify themselves as policemen, he believed they were hoodlums sent to kill him, and this was why he had run:

> the night when I ran from the house, I didn't know who the hell that was. They came in there, I didn't know who was coming in there. There was just a loud

bang at the door, they were kicking, they don't pronounce themselves as cops to me. I jumped out the window and ran from Second Street to Third Street. And then when I seen the Albany police car, that's when I knew what the deal was. And I got down on my kn[e]es and put my hands on my head and I surrendered to these people. I didn't try to run from them. I more or less, when I ran out of there, I ran out because I was scared for my goddam life. I had the Richb[u]rgs calling, sending people to my mother's house, my brother's house, calling from jail, talking like they were going to kill me, all right.

(*Id.* at 86–87.)

Although the government's prehearing memorandum had expressly urged only one ground for an obstruction-of-justice enhancement, *i.e.*, Reed's failure to appear for sentencing on November 19, after the close of the hearing testimony the government argued as follows:

> I think by definition, Your Honor, for obstruction of justice, the Court can see in the definitions in the guidelines that a failure to appear for a judicial proceeding constitutes an obstruction of justice. And that's what this defendant did. The defendant was aware that he had to appear on November 19, 1993, before this Court for sentencing.
>
> The defendant was released under the condition that he appear when so ordered for sentencing. And it was more than a month, well, it was approximately a month between the time the defendant failed to appear and he was apprehended. In those weeks and weeks that went by, no effort was made by this defendant—on November 20, 1993, he could have turned himself in, throughout the entire months of November and December up until December 15th, each day presented a new opportunity for the defendant to turn himself in, if he chose. He chose not to. And when located by the police, he jumps out of the window and tries to abscond by running up the street and around the corner. So the defendant has satisfied the condition for the obstruction of justice enhancement.

(Sentencing Transcript dated March 25, 1994 ("March 25 Tr."), at 10–11.)

The district court determined that Reed's offense level should be enhanced for obstruction of justice and that he should be denied a reduction for acceptance of responsibility. The court explained its decision as follows:

[T]he Court, after considering the conduct of the defendant since the time of his plea and his failure to appear for previously scheduled sentencing hearing, has included a two-level upward adjustment for obstruction of justice, and has denied the downward adjustment for three levels for acceptance of responsibility.

The Court is convinced that, Mr. Reed, during the course of your time here before this Court, you have attempted to manipulate people and matters to the best of your ability and have failed to comply with the directions and instructions of the Court accorded by your release. Whether or not you are guilty of any criminal conduct, the Court is not considering. The Court is considering your conduct, what you did as far as your obstructions in the period of your release.

(Id. at 13.) The resulting Guidelines range was 151–188 months. Pursuant to Guidelines § 5K1.1, in recognition of the assistance Reed had given the government, the court departed downward by seven months and sentenced Reed to 144 months' imprisonment.

This appeal followed.

## II. DISCUSSION

On appeal, Reed argues principally that the offense-level enhancement for obstruction of justice was improper because the district court did not make a finding that his failure to appear at sentencing was willful. We agree.

### A. Obstruction of Justice

The Guidelines provide that the sentencing court should increase a defendant's offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Guidelines § 3C1.1. Among the types of behavior that can warrant an obstruction-of-justice enhancement are "willfully failing to appear, as ordered, for a judicial proceeding," Guidelines § 3C1.1, Application Note 3(e); see also United States v. Aponte, 31 F.3d 86, 88 (2d Cir.1994), or "[f]light from pretrial services between conviction and sentencing," United States v. Defeo, 36 F.3d 272, 276 (2d Cir. 1994), or deliberately changing residence in order to avoid detection of unlawful activity while on release prior to sentencing, see id. at 276–77.

Whatever circumstances are alleged to constitute obstruction in a particular case, an enhancement under § 3C1.1 is not appropriate, by the terms of that section, unless the obstruction was "willful[ ]." We have observed that the term "willfully" implies a mens rea requirement, see, e.g., United States v. Stroud, 893 F.2d 504, 507 (2d Cir.1990). Thus, such an adjustment is appropriate only if "the defendant had the specific intent to obstruct justice; i.e., ... the defendant consciously acted with the purpose of obstructing justice." United States v. Defeo, 36 F.3d at 276 (internal quotes omitted); see also United States v. Bonds, 933 F.2d 152, 154 (2d Cir.1991) (per curiam) (deliberate change in appearance could not be the basis of a § 3C1.1 enhancement where evidence did not establish that it was done with the purpose of obstructing investigation); United States v. Stroud, 893 F.2d at 507 (flight from arrest in immediate aftermath of a crime cannot by itself justify enhancement under § 3C1.1). Certain conduct, however, such as intentionally failing to appear as required at judicial proceedings, is so inherently obstructive of the administration of justice that it is sufficient that the defendant willfully engaged in the underlying conduct, regardless of his specific purpose. See United States v. Aponte, 31 F.3d at 88 ("It is sufficient for these purposes that the defendant intended to fail to appear at a judicial proceeding, regardless of his reason for desiring to flee.").

When the sentencing court resolves a disputed issue of fact, it is required to state

its findings with sufficient clarity to permit appellate review. *See generally United States v. Lanese,* 890 F.2d 1284, 1294 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990). In order to impose a § 3C1.1 obstruction-of-justice enhancement on a defendant who has raised an issue as to his state of mind concerning the conduct alleged to have obstructed or impeded the administration of justice, the court must make a "specific finding of intent." *United States v. Thomas–Hamilton,* 907 F.2d 282, 285 (2d Cir.1990); *see United States v. Defeo,* 36 F.3d at 276. Where the sentencing judge neither clearly resolves the disputed issue nor explicitly relies on factual assertions made in a PSR, we must remand for further findings. *See, e.g., United States v. Maturo,* 982 F.2d 57, 62 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2982, 125 L.Ed.2d 679 (1993). If the court decides that an enhancement is warranted and the government has proffered more than one basis for the enhancement, the court should specify the basis or bases on which it has relied and make the pertinent findings. *See, e.g., United States v. Amato,* 46 F.3d 1255, 1263–64 (2d Cir.1995); *see also United States v. Stevens,* 985 F.2d 1175, 1185–87 (2d Cir.1993) (bases for upward departure). In this manner, if one of the bases is either improper or unsupported but is not the ground on which the court relied, a remand may be avoided. *See generally United States v. Santiago,* 906 F.2d 867, 873–74 (2d Cir.1990) (remand required where it is unclear whether sentencing court relied on permissible or impermissible basis).

■ On the present appeal, the government appears to rely solely on Reed's failure to appear on November 19 and his failure to turn himself in thereafter as proper bases for the obstruction-of-justice enhancement, and it claims never to have relied on Reed's flight from the officers on December 15 as a basis for the enhancement. In the district court, however, the government appeared to press for the obstruction enhancement on any of four grounds, *i.e.,* (a) that Reed had failed to appear for sentencing on November 19 (the only basis advanced by the addendum to the PSR); (b) that he had attempted to escape when the officers attempted to arrest him on

December 15; (c) that he had left his Troy residence and failed to report to the authorities as required by his bail conditions; or (d) that after Reed learned that his sentencing date had passed, his failure each day thereafter to turn himself in constituted an obstruction of justice. Reed denied that he had the requisite intent with respect to any of these grounds, and he gave explicit explanations for most of them.

The district court did not make findings sufficient to reveal which of the bases on which the government presented evidence or argument formed the basis of the court's decision to enhance for obstruction of justice, and it made no findings that the conduct it believed was obstructive was willfully so. The court's statement that it was "considering the conduct of the defendant since the time of his plea and his failure to appear for ... sentencing" is unclear as to whether the court was relying on Reed's failure to appear on November 19 or on his conduct since the time of his failure to appear. If the court was relying in part on the failure to appear itself, its reliance was inappropriate since it made no finding that Reed knew prior to November 19 that his sentencing had been rescheduled for that date. In the absence of such a finding, it is difficult to infer that his failure to appear on that date was willful.

Nor do we think it clear that a finding of such knowledge would have been supported by a preponderance of the evidence that was adduced at the sentencing hearing. The government argues in its brief on appeal that "Appellant himself testified that he was notified by his attorney one week prior to the November 19, 1993 sentence date regarding his appearance." (Government's brief on appeal at 7.) The district court did not so find, however; and a reading of Reed's testimony, quoted in Part I above, surely does not compel that interpretation. Reasonably read in context, the testimony seems to have been that Reed's attorney attempted to notify Reed one week in advance but could not locate him to do so. (*See* March 24 Tr. at 86 ("... I was nowhere to be found"); *id.* ("I didn't find out, your Honor, until like a week later"); *id.* at 90 ("At the time the date that was set for me to appear in court, I had no, I

had no knowledge that I was supposed to be here"); *id.* ("THE COURT: You weren't advised of the new date? THE WITNESS: No. I found out that I was supposed to be in court, was like a week later.").) We note that the government's brief also states that "the plea agreement was conditioned upon the Appellant's appearance at sentencing *on November 19, 1993*" (government's brief on appeal at 3 (emphasis added)). But that date is not in the plea agreement and does not appear in the record of the plea hearing. Indeed, that date apparently was not set until some six months after the plea agreement was entered into.

To the extent that the court was adopting the government's argument that, if Reed learned only after November 19 that he was supposed to have appeared for sentencing on that date, his failure thereafter to turn himself in constituted an obstruction of justice, that rationale is not clear from the decision. Further, that proposition is one for which the government has advanced no supporting authority; it has cited one case in which a requested enhancement on this theory was rejected, *United States v. Monroe*, 990 F.2d 1370, 1375–76 (D.C.Cir.1993). We express no view as to the viability of this theory.

The only express identification of conduct by Reed in the court's explanation of its enhancement decision, other than the failure to appear on November 19, was the finding that Reed had violated his bail conditions and had sought to "manipulate people." Since the court expressly declined to consider whether Reed had engaged in any unlawful behavior while on release, these statements were presumably references to Reed's change of residence and his treatment of the reporting requirements. However, the court made no finding that Reed had quit his Troy residence in an effort to thwart the disposition of the criminal charges against him. Reed testified that emissaries from the Richburgs had come to his home, assaulted him, and "tor[n] the place up." Reed testified that if he had wanted to flee from the authorities, he would have gone farther away than Albany (eight miles from Troy). He testified that he stayed in the area because he wanted to cooperate with the authorities in hopes of reducing his sentence. The court similarly made no finding that Reed's seeking to deal with the DEA instead of the FBI or his probation officer was an attempt to avoid being sentenced at all, rather than an attempt, as Reed testified, to earn a more lenient sentence.

Finally, as to Reed's conduct when the officers sought to arrest him, the court did not find that he knew that the men from whom he attempted to escape were law enforcement officers. Reed's story that he thought the men were would-be assailants sent by the Richburgs was not implausible; the court itself recognized that Reed had been cooperating with the authorities and stated that "when you do cooperate, there are risks involved, we all recognize that." (March 24 Tr. at 95.) And according to the testimony of DEA agent Rice, the officers did not identify themselves prior to or upon entering the Albany house; rather they entered, Reed then jumped out the window, and the officers did not "start[ ] yelling police" until "Reed hit the sidewalk."

In sum, we find the record unclear as to what basis the sentencing court adopted in enhancing Reed's offense level for obstruction of justice. And as to none of the proffered bases did the court find that Reed's intent was to obstruct justice or to do an act that was inherently such an obstruction. Accordingly the matter must be remanded for the court to make appropriate findings.

We note that in considering on remand the various proffered bases for the obstruction enhancement, the court may be confronted with several doctrinal questions whose answers are not yet clear. For example, in assessing whether or not Reed's failure to appear for sentencing on November 19 was "willful," the court must first determine whether or not he actually knew prior to November 19 that his sentencing had been rescheduled for that date. But if the court finds that Reed did not have actual knowledge, it might consider whether there is evidence that he deliberately took action designed to avoid receiving the scheduling information, and if there is such evidence, the court should consider whether the concept of conscious avoidance is applicable to the

knowledge component of the obstruction issue. *Cf. United States v. Bader,* 956 F.2d 708, 710 (7th Cir.1992) ("suspicion plus taking steps to avoid acquiring additional information [could be] a form of knowledge" within meaning of Guidelines § 2K1.4(b)(1) (1989) (knowing creation of risk of serious bodily harm)); *United States v. Gurary,* 860 F.2d 521, 523, 527 & n. 6 (2d Cir.1988) (conscious avoidance instruction may be appropriate with respect to defendant's knowledge of the objectives of an alleged conspiracy to "willfully" violate tax laws), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989).

Further, in assessing whether Reed's attempt to escape from the officers seeking to arrest him on December 15 constituted attempted obstruction (assuming the court finds that Reed knew that the men were law enforcement officers), the court would be required to determine whether Guidelines § 3C1.1 is to be interpreted differently with respect to an attempt to escape execution of an arrest warrant to compel the defendant to appear for sentencing than it has been interpreted with respect to an attempt to escape arrest in connection with investigation or prosecution of the offense of conviction. The section itself refers to obstructions "during the investigation, prosecution, or sentencing of the instant offense." Guidelines § 3C1.1. The commentary states that, ordinarily, "avoiding or fleeing from arrest" does "not warrant application of [the obstruction] enhancement" unless there is "a separate count of conviction for such conduct." Guidelines § 3C1.1 Application Note 4(d). This has been interpreted to mean that flight to avoid arrest in the immediate aftermath of a crime cannot by itself justify enhancement under § 3C1.1. *See, e.g., United States v. Mondello,* 927 F.2d 1463, 1467 n. 4 (9th Cir.1991); *see also United States v. Stroud,* 893 F.2d at 507 (same interpretation of guideline prior to adoption of Application Note 4(d)). This Court has not addressed whether the outcome should be different when the defendant has failed to appear for sentencing, an arrest warrant has therefore been issued for him in connection with sentencing, and he has attempted to escape from officers attempting to execute that warrant. *Cf. United States v. Vargas,* 986 F.2d 35, 41–42 (2d Cir.) (en-

hancement appropriate where defendant attempted to flee during controlled delivery in which he was cooperating after his arrest and grabbed officer's gun when apprehended), *cert. denied,* —— U.S. ——, 113 S.Ct. 2417, 124 L.Ed.2d 640 (1993).

We express no view as to the proper resolution of the unsettled legal issues, which may or may not become material in light of the district court's views of the record, and we do not mean to suggest that the above examples are exhaustive.

**B.** *Acceptance of Responsibility*

Reed also contends that the district court erred in denying him credit for acceptance of responsibility. The government had argued that such a denial was appropriate not only on the ground of Reed's alleged obstruction(s) of justice but also on the ground that, during his release, Reed had resumed his unlawful activities. The government produced a witness to testify to such activities. Reed disputed the witness's testimony, stating that she testified falsely because of her relationship to a man whom Reed had helped the authorities to arrest. In denying Reed credit for acceptance of responsibility, the district court does not appear to have relied on the theory that Reed had engaged in unlawful activity. (*see* March 25 Tr. at 13 ("Whether or not you are guilty of any criminal conduct, the court is not considering.")); rather, it appears to have denied that credit solely on the basis that it found he had obstructed justice (*see id.* ("The Court is considering your conduct, what you did as far as your obstructions in the period of your release.")).

The denial of credit for acceptance of responsibility under § 3E1.1 is usually appropriate when the court has found that the defendant's offense level should be increased under § 3C1.1 for obstruction, or attempted obstruction, of justice. *See* Guidelines § 3E1.1. Application Note 4; *United States v. Defeo,* 36 F.3d at 277 ("it is rare that a defendant should be granted a reduction in offense level for acceptance of responsibility when the court has deemed it appropriate to increase her offense level for ob-

struction of justice"); *United States v. Ira-bor*, 894 F.2d 554, 557 (2d Cir.1990) (acceptance-of-responsibility departure not warranted when defendant has obstructed justice). In the present case, however, as discussed above, the court did not make sufficient findings to support an obstruction-of-justice enhancement. We therefore cannot uphold its in-tandem denial of credit for acceptance of responsibility. On remand, the court should consider the acceptance-of-responsibility.

## CONCLUSION

For the foregoing reasons, the judgment is vacated, and the matter is remanded for further findings and resentencing not inconsistent with the foregoing.