**UNITED STATES of America,**
Appellee,

v.

**Alan FINKELSTEIN, Defendant–**
**Appellant.**

No. 99–1565.

United States Court of Appeals,
Second Circuit.

Argued: April 10, 2000

Decided: Oct. 2, 2000

Robin W. Morey, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Baruch Weiss, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

John L. Pollok, New York, New York (William A. Rome, Hoffman, Pollok &

Pickholz, New York, New York, on the brief), for Defendant-Appellant.

Before: NEWMAN, KEARSE, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Alan Finkelstein appeals from a judgment entered in the United States District Court for the Southern District of New York following his plea of guilty before Deborah A. Batts, *Judge,* convicting him of money laundering, in violation of 18 U.S.C. § 1956 (1994), and conspiracy to launder money, in violation of 18 U.S.C. § 371 (1994). Finkelstein was sentenced principally to 36 months' imprisonment, to be followed by a three-year term of supervised release; pursuant to 18 U.S.C. § 982 (1994), he was also ordered to forfeit $300,000. On appeal, he challenges the length of his imprisonment, contending principally that the district court improperly used a conscious-avoidance theory to enhance his sentence pursuant to Sentencing Guidelines ("Guidelines") § 2S1.1(b)(1) for conspiring to launder money known to be proceeds of unlawful narcotics-related activity. For the reasons that follow, we reject Finkelstein's contentions and affirm.

## I. BACKGROUND

Section 1956 prohibits any person from, *inter alia,* conducting a financial transaction involving property that "represents the proceeds of some form of unlawful activity," knowing that the transaction is designed to conceal or disguise the source or ownership of such property. 18 U.S.C. § 1956(a)(1). The present prosecution arises out of the government's investigation of Finkelstein, sole owner and operator of Gold Standard Trading Corporation ("Gold Standard"), a business in the New York City diamond and jewelry district, and his coconspirators Ahron Sharir, Luis Roges, and Barry Slomovits, each of whom also owned and operated jewelry and precious metals businesses. Count one of the information to which Finkelstein pleaded guilty alleged that during a nine-year period beginning in 1982, Finkelstein's coconspirators received at their respective places of business a total of at least half a billion dollars that were the proceeds of narcotics trafficking; that the coconspirators laundered those proceeds through Finkelstein and others; and that Finkelstein himself, through Gold Standard, laundered more than $20 million that were proceeds of illegal narcotics activity. Count two of the information charged that Finkelstein also laundered nearly $1.7 million that were proceeds of unlawful gambling and bookmaking activities.

### A. *Finkelstein's Plea of Guilty*

Pursuant to a cooperation agreement with the government, Finkelstein agreed to plead guilty to laundering and conspiring to launder moneys while knowing that the moneys were "proceeds from some form" of criminal activity, "though not necessarily which form." (Plea Agreement dated December 12, 1994, at 1.) Accordingly, at his plea hearing, Finkelstein stated as follows:

From 1986 to 1991, I conspired with Barry Schlomovitz [*sic* ] and others engaged in financial transactions that permitted others to disguise the source and the ownership of their proceeds from illegal activities. By 1989 I became aware that the funds were generated by criminal activity but despite such knowledge I continued to engage in financial activities that permitted the ownership and source of the funds to be disguised. I knew that it was both wrong and illegal to engage in such activity since I knew that the funds involved were from some form of criminal activity that constituted a felony under the state or federal law. At some point I did learn that some of the funds included proceeds of illegal gambling. I performed such activity while operating a legitimate business enterprise in Manhattan where

these activities took place. The amount laundered exceeded $20,000,000.

(Hearing Transcript, January 9, 1995 ("Tr."), at 13–14.)

At the plea hearing, the Assistant United States Attorney ("AUSA") gave a general description of the evidence that the government could present if there were a trial. The government would show that Slomovits and Finkelstein's other coconspirators, at their places of business, received cash from Colombian couriers. Finkelstein participated in the conspiracy "from approximately 1986 to in or about November 1991." (Tr. 14.) In some instances, Finkelstein would take possession of the cash and would then return a check in a lesser amount (the difference representing Finkelstein's laundering commission) drawn on Gold Standard's account. In other instances, his coconspirators would use the to-be-laundered cash to purchase gold from Finkelstein at artificially inflated prices; Finkelstein would then repurchase the gold from them at lower prices, again making payment with his company's checks.

In response to questioning by the district court, Finkelstein stated that he agreed with the government's description of his money-laundering activities. However, while conceding that he knew the funds he laundered were proceeds of unlawful activity, he maintained that he "didn't know it was from narcotics." (Tr. 16.)

B. *The PSR Recommendations and the Sentence*

The presentence report ("PSR"), prepared on Finkelstein in 1999, following a period of his cooperation with the government in investigating others, noted that under Guidelines § 2S1.1(a)(2) (1998), Finkelstein's base offense level would be 20, from which § 2S1.1(b)(2)(K) required a 10–step increase because the value of the funds laundered by Finkelstein in the present offenses was more than $20 million and less than $35 million. In addition, the PSR recommended a three-step increase pursuant to Guidelines § 2S1.1(b)(1), which provides that the offense level of a defendant convicted of money laundering is to be increased by three steps "[i]f the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances." Guidelines § 2S1.1(b)(1) (1998). The PSR stated that, "[b]ased on the fact that 1) Sharir, Roges, and Slomovits were aware that the funds were the proceeds of unlawful activities involving narcotics, and 2) the significant amount of monies that were laundered, we believe that Finkelstein knew or believed that the funds were proceeds of unlawful activities involving narcotics." (PSR ¶ 77.) Recommending a downward adjustment in offense level on the basis that Finkelstein had adequately accepted responsibility for his offense, the PSR concluded that Finkelstein's total offense level was 30.

Finkelstein objected to the PSR, arguing, *inter alia,* that it failed to recommend an offense-level decrease on the basis that he played a minor role in the offense (*see* Part II.C. below), and that it erred in recommending a § 2S1.1(b)(1) enhancement for knowing that he was laundering narcotics proceeds. With respect to the proposed § 2S1.1(b)(1) increase, Finkelstein argued preliminarily that the "or believed" language should not be applied to him because it had not become part of that guideline until November 1, 1991, which he asserted was after his offense conduct had ended. As to the merits of the proposed increase, Finkelstein contended that a § 2S1.1(b)(1) enhancement would be appropriate only if the evidence showed he had actual knowledge of the narcotics provenance of the money, and that there was no evidence that he had such knowledge. He maintained that he "was never told by anyone that the gold he was purchasing was proceeds from narcotics transactions." (Letter from Finkelstein's then-

attorney Carl D. Bernstein to Probation Office dated June 22, 1999, at 2.)

In response to Finkelstein's objections, the Probation Department added an Addendum to the PSR. With respect to the § 2S1.1(b)(1) increase, the Addendum stated that

the Probation Department believes that conscious avoidance is proper knowledge to illustrate that Finkelstein was aware that the proceeds he laundered were from illegal narcotics activities,

(PSR at 28), and that the issue was not whether Finkelstein believed the funds came from drug sales but whether knowledge should be imputed to him because of his willful blindness to circumstances that made it apparent that the funds he laundered came from drug sales. As evidence of Finkelstein's willful blindness, the Addendum stated that

during an interview with a U.S. Customs agent, Finkelstein told the agent that he, "eventually suspected that the source of the cash was narcotics, because 'people were being arrested right and left.' Although he was never told directly that the cash came from narcotics, he said 'you would have to be stupid' not to suspect that his [sic] was the source of the money."

(*Id.*) Accordingly, the Probation Department adhered to the original PSR recommendation of a three-step increase pursuant to § 2S1.1(b)(1).

Finkelstein objected to the conclusion drawn in the PSR Addendum and stated in part as follows:

Your reliance on "an interview with a U.S. Customs agent" which mostly paraphrases statements attributed to Mr. Finkelstein further supports our position. The agent's report actually confirms our contention: that Mr. Finkelstein was unaware at the beginning, and for a period of time thereafter, of the actual source of the funds that were used in the gold purchases.

(Letter from Carl D. Bernstein to Probation Office dated July 12, 1999, at 2 (footnote omitted).)

The government endorsed the positions taken in the PSR Addendum. It pointed out that the "or believed" phrase in the 1991 version of § 2S1.1(b)(1) was not relevant to Finkelstein's case, as that language had been added to accommodate government "sting" operations (a view eventually concurred in by Finkelstein). With respect to the merits of the PSR recommendation, the government stated that

[w]hile the Government does not believe that Alan Finkelstein ever had direct knowledge of the drug source of the money he was laundering, it is the Government's position that Mr. Finkelstein willfully blinded himself as to the source of the money. He specifically never inquired as to the source of the money. The three individuals who were providing him with the money, Sharir, Roges and Slomovits, have not advised the government that they gave Mr. Finkelstein some bogus explanation, rather that they just never addressed the subject.

(Letter from AUSA Robin W. Morey to Judge Batts dated July 26, 1999 ("Government's July 26 Letter"), at 1.) The government also stated that it viewed Finkelstein's challenge to the § 2S1.1(b)(1) enhancement as a legal, not a factual, challenge:

That Mr. Finkelstein willfully blinded himself to the true facts, is a fact I do not believe the defendant disputes. The defendant, rather, contends that even if he willfully blinded himself to the facts regarding the source of the money he was laundering, the guidelines do not authorize the 3–level enhancement for that type of knowledge and essentially argues that only direct knowledge will suffice.

(Government's July 26 Letter at 1–2.) In sum, while the government had moved pursuant to Guidelines § 5K1.1 for a downward departure in recognition of Finkelstein's substantial cooperation in

connection with the prosecution of several persons conducting illegal gambling and bookmaking activities, the government urged that the point from which any departure was to be made should be offense level 30, as recommended by the PSR. Finkelstein made no response to the government's July 26 views.

At the sentencing hearing, the district court, after determining that the parties had no objections that they had not already presented, adopted the factual recitations set out in the PSR and concluded that Finkelstein's proper offense level was 30 for the reasons stated in the PSR. Granting a downward departure from that level for cooperation with the government, the court sentenced Finkelstein as indicated above. This appeal followed.

## II. DISCUSSION

On appeal, Finkelstein contends principally that the doctrine of conscious avoidance is inapplicable to enhancements under Guidelines § 2S1.1(b)(1), arguing that the language of the guideline, *i.e.*, "knew," rather than knew-or-should-have-known, precludes use of the doctrine, and that traditionally the doctrine has been applied only with respect to criminal liability, not questions of punishment. Finkelstein also argues that even if that doctrine may ordinarily be applied in sentencing, the evidence was insufficient to permit its use in this case. In addition, he contends that his role in the offense was minor and that the district court should have reduced his offense level to reflect the extent of his participation. We see no merit in these contentions.

### A. *Applicability of the Conscious–Avoidance Doctrine*

The conscious-avoidance doctrine is that, with respect to an offense in which the defendant's knowledge of a given fact is an element, the knowledge element is established if the factfinder is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence, *see, e.g., United States v. Walker*, 191 F.3d 326, 337 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1702, 146 L.Ed.2d 506 (2000); *United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir. 1997); *United States v. Boothe*, 994 F.2d 63, 69 (2d Cir.1993), unless the factfinder is persuaded that the defendant actually believed the contrary. *See, e.g., United States v. Sicignano*, 78 F.3d 69, 71 (2d Cir.1996) (per curiam); *United States v. Shareef*, 714 F.2d 232, 233 (2d Cir.1983); *United States v. Cano*, 702 F.2d 370, 371 (2d Cir.1983) (per curiam). The rationale for imputing knowledge in such circumstances is that one who deliberately avoided knowing the wrongful nature of his conduct is as culpable as one who knew.

The fact that Guidelines § 2S1.1(b)(1) uses the simple word "knew," rather than a knew-or-should-have-known phrase, plainly does not foreclose resort to the conscious-avoidance concept. To begin with, the should-have-known alternative connotes a concept more akin to negligence than to knowledge. *Accord United States v. Bader*, 956 F.2d 708, 710 (7th Cir.1992). Further, the conscious-avoidance concept has commonly been used in connection with substantive statutes that do not contain that phrase but prohibit conduct that is "knowing[ ]." *See, e.g., United States v. Hopkins*, 53 F.3d 533, 541–42 (2d Cir.1995) (conscious-avoidance instruction appropriate with respect to 33 U.S.C. § 1319(c)(4) ("knowingly falsifies, tampers with, or renders inaccurate any [water-pollution] monitoring device or method required to be maintained under this chapter")); *United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir.1995) (same with respect to 18 U.S.C. § 894(a)(1) ("knowingly participates ... in the use of any extortionate means ... to collect any extension of credit")); *United States v. Bahadar*, 954 F.2d 821, 831 (2d Cir.1992) (same with respect to 21 U.S.C. § 841(a) ("knowingly or intentionally ... manufacture[s], distribute[s], or dispense[s] ... a controlled substance")); *United States v. Abrams,*

427 F.2d 86, 91 (2d Cir.1970) (same with respect to 18 U.S.C. § 1001 ("knowingly and willfully ... makes any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the federal government)). We thus reject Finkelstein's contention that § 2S1.1's use of the simple word "knew" precludes resort to the conscious-avoidance concept.

■ Nor is there merit in Finkelstein's argument that evidence of conscious avoidance, though permissible to establish criminal liability, is an inappropriate consideration in sentencing. In determining what sentence within the statutory range is appropriate for a given defendant, the district court is entitled to take into account any relevant information to which it has access. *See, e.g., United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (district judge's discretion in sentencing is "largely unlimited either as to the kind of information he may consider, or the source from which it may come"). So long as the defendant is given an opportunity to contest the accuracy of the information, *see, e.g., Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), the court may rely even on information that would not have been admissible at trial, *see, e.g., Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); Guidelines § 6A1.3 ("[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence."). We see no sound basis for Finkelstein's proposal to bar the sentencing court, which is allowed to consider evidence that would have been inadmissible at trial, from considering information that would have been admissible.

Finally, Finkelstein's apparent assumption that the conscious-avoidance doctrine has not been applied in sentencing is erroneous. In *United States v. Reed,* 49 F.3d 895 (1995) ("*Reed I*"), this Court consid-

ered a sentencing enhancement for obstruction of justice pursuant to Guidelines § 3C1.1 and vacated the sentence because the district court had not made the requisite finding that the obstruction at issue— the defendant's failure to appear for a scheduled sentencing hearing—was "willful" within the meaning of that section. *See* 49 F.3d at 896. In remanding, we suggested that if the record did not reflect the defendant's actual knowledge of the hearing date, the district court might properly consider whether the conscious-avoidance concept could be applied. *See id.* at 902–03. When the case returned to us following the proceedings on remand, the district court had found, *inter alia,* that by failing to keep in touch with his attorney and not keeping the attorney apprised of his whereabouts in order to be notified of any changes in the sentencing date, the defendant " '*consciously avoided knowing when the date was for ... sentenc[ing].*' " *United States v. Reed,* 88 F.3d 174, 179 (2d Cir.1996) ("*Reed II*") (quoting district court ruling) (emphasis in *Reed II* ). We affirmed the obstruction-of-justice enhancement on the basis of that finding. *See id.* at 180 ("The finding that Reed consciously avoided timely knowledge of his new sentencing date [wa]s a permissible inference" from the evidence.).

In sum, we have in the past approved use of the conscious-avoidance doctrine in connection with sentencing, and we see no sound jurisprudential basis now for barring the sentencing court from using it in considering whether an enhancement is appropriate under Guidelines § 2S1.1.

B. *Sufficiency of the Evidence of Conscious Avoidance*

■ We also reject Finkelstein's challenge to the sufficiency of the evidence to permit an inference that he consciously avoided knowing that the moneys he laundered were proceeds of unlawful narcotics trafficking. Sufficient evidence for that inference was available largely from Finkelstein's own statements.

There is no dispute that Finkelstein's participation in the money-laundering conspiracy began in 1986 and did not end until in or about November 1991, having continued after the arrests of Sharir in March 1990 and Roges in May 1991. The PSR Addendum quoted a federal agent's interview of Finkelstein in which Finkelstein

> "told the agent that he[ ] eventually suspected that the source of the cash was narcotics, because 'people were being arrested right and left.' Although he was never told directly that the cash came from narcotics, he said 'you would have to be stupid' not to suspect that his [*sic*] was the source of the money."

(PSR at 28.) Finkelstein did not deny that he made the statements attributed to him; rather, he argued for a different interpretation of the statements, stating that the "[t]he agent's report actually confirms our contention: that Mr. Finkelstein was unaware at the beginning, and for a period of time thereafter, of the actual source of the funds...." (Letter from Carl D. Bernstein to Probation Office dated July 12, 1999, at 2.) But the mere denial of knowledge at the start of his six-year money-laundering conduct "and for a period" thereafter was entirely consistent with the evidence suggesting that Finkelstein "suspected" for at least the last six months of his money-laundering activities (*i.e.*, after both Sharir and Roges had been arrested) "that the source of the cash was narcotics"—because he would have had to be "stupid" not to suspect that this was the source. These statements, read in conjunction with Finkelstein's admissions in his plea allocution that he knew the funds he laundered "were generated by criminal activity," and that "despite such knowledge" and despite knowing therefore "that it was both wrong and illegal to" disguise its source and ownership he continued to launder the money (Tr. 13), made it clearly permissible to infer that if Finkelstein did not actually know the millions of dollars he was illegally laundering were drug moneys, he knew there was a high probability of that fact and consciously avoided knowledge.

## C. *Finkelstein's Request for a Role Adjustment*

Finally, we reject Finkelstein's contention that he was entitled to a two-step reduction in offense level on the basis that his role in the offense was minor. The Guidelines provide for such a decrease "[i]f the defendant was a minor participant in any criminal activity," Guidelines § 3B1.2(b), that is, a "participant who [wa]s less culpable than most other participants, but whose role could not be described as minimal," *id.* Application Note 3. In assessing the applicability of this adjustment, the sentencing court must gauge the defendant's culpability in light of the elements of the offense of conviction as well as in relation to the culpability of the other participants. *See, e.g., United States v. Neils*, 156 F.3d 382, 383 (2d Cir. 1998) (per curiam).

Finkelstein argues that his role in the money-laundering conspiracy was minor because he laundered only $20–$25 million of the more than $500 million that passed through the hands of his coconspirators. The district court correctly rejected that characterization, for Finkelstein's focus on the $500 million figure is misplaced.

Guidelines § 2S1.1(b)(2) sets out a 13-step scale of offense-level increases linking a money-laundering defendant's offense level to the amount of money he laundered. The laundering of more than $20 million but not more than $35 million calls for a 10-step increase, *see* Guidelines § 2S1.1(b)(2)(K); the laundering of more than $100 million calls for a 13-step increase, *see id.* § 2S1.1(b)(2)(N). The commentary states that "[t]he amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, *and the extent to which the defendant aided the enterprise.*" *Id.* § 2S1.1(b)(2) Background (emphasis added).

Finkelstein admitted his personal involvement in laundering more than $20 million, and his offense level was accordingly increased by 10 steps, not by the 13 steps that would have been required if he were held to have aided the enterprise to launder all $500 million. Thus, Finkelstein's personal involvement in less than the total amount laundered by the coconspirators was factored into his sentence in connection with the calculation of his offense level. With regard to the more than $20 million laundered by Finkelstein himself, Finkelstein proffered no basis for finding his role to have been minor.

## CONCLUSION

We have considered all of Finkelstein's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.