**UNITED STATES of America,**
**Appellee,**

v.

**Adrian RILEY, Defendant–Appellant.**

**Docket No. 05–1585–cr.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 20, 2005.

Decided: June 21, 2006.

John M. Conroy, Assistant United States Attorney, Burlington, VT (David V. Kirby, United States Attorney for the District of Vermont, Paul J. Van De Graaf, Chief, Criminal Division, Burlington, VT), for Appellee.

Kerry B. DeWolfe, Barre, Vermont (Rubin, Kidney, Myer & DeWolfe, Barre, VT), for Defendant–Appellant.

Before KEARSE, MINER, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Adrian Riley appeals from a judgment of the United States District Court for the District of Vermont, convicting him, following his plea of guilty before William K. Sessions III, *Chief Judge,* of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and sentencing him principally to 120 months' imprisonment, to be followed by a two-year term of supervised release. On appeal, Riley argues that his sentence was improperly enhanced on account of (a) prior convictions that he contends should have been disregarded because he was a "youthful offender," and (b) acts that he contends the court erroneously found to constitute an obstruction of justice within the meaning of Sentencing Guidelines ("Guidelines") § 3C1.1.

## I. BACKGROUND

The present matter has its origin in an investigation by the United States Drug Enforcement Administration ("DEA") into narcotics trafficking in Vermont. The events, for purposes of this appeal, are not in dispute.

### A. *The Focus on Riley*

In March 2004, DEA agents executed a search warrant at an apartment in Essex, Vermont. They seized evidence, arrested three men—not including Riley—and learned that Riley had been involved in the sale of drugs from that apartment. Riley, however, quickly learned of the raid and avoided immediate arrest by fleeing to Florida with, among others, his girlfriend Jennifer Johnson. Riley and Johnson remained in Florida for several weeks, returning in May.

Following his return, Riley obtained an M–1 assault rifle and had its barrel and stock shortened by Travis Guy, one of his narcotics customers. In exchange, Riley gave Guy several grams of crack cocaine. Thereafter, Guy gave Riley a Remington rifle in payment of a past-due debt for a prior crack purchase.

In mid-May, DEA agents were informed that Riley, after his return to Vermont, accosted the confidential informant ("CI") who had cooperated in their initial investigation, accusing the CI of "ratting" on Riley and his associates, and that one of Riley's companions assaulted the CI. A CI also informed DEA agents of hearing conversations in which Riley threatened to harm two persons for talking to the police; in connection with one of those conversations, Riley carried a handgun. The government filed a criminal information charging Riley with retaliation against a witness, in violation of 18 U.S.C. § 1513(b)(2), and a warrant was issued for his arrest. Riley was not located, however, for several weeks.

In mid-June, the DEA learned that Riley was staying at a Budget Inn motel in Barre, Vermont, registered under the name "Jamal Watson," and was driving a blue Volvo station wagon. On June 16, they spotted Riley's car and began to follow it. The car was being driven by Johnson, who noticed the trailing authorities and alerted Riley. Riley initially did not believe her; but after Johnson took a few turns down side roads, Riley left the car and fled into the woods. He was apprehended later that day. Riley told the officers his name was "Jamal Watson," and he was soon indicted for making that false statement, in violation of 18 U.S.C. § 1001.

### B. *Johnson's Concealment of Riley's Guns*

After letting Riley out of the car in his attempt to elude the authorities, Johnson went first to the home of a friend and then back to the room she shared with Riley at the Budget Inn. There, she removed the two rifles and a few of the other items belonging to Riley. Johnson testified that she removed the guns because Riley had told her to conceal them if he got arrested.

(*See* Sentencing Transcript, March 18, 2004 ("S.Tr."), at 81–82 ("That was something that was pre-discussed before he got locked up, that if something was to happen, then this is what I was to do."); id. at 95 ("he said ... to get rid of everything, if he was to get locked up").) Johnson took the firearms to a friend's mobile home in Washington, Vermont, and hid them in a closet.

On June 17 and several times over the course of the next few days, Riley telephoned Johnson from jail. In those calls, which were routinely recorded by the correctional facility, Riley repeatedly made reference to his "bitches," by which Johnson understood him to mean his guns (*see* S.Tr. 63–64). During these conversations, Riley vacillated as to whether Johnson should discard the guns or continue to conceal them. In the first such conversation, Riley sought to confirm that Johnson had secured the guns, and he ultimately instructed her to get rid of them:

AR [Adrian Riley]: Where's the, where's my bitches at?

JJ [Jennifer Johnson]: They're put away, baby.

AR: *Hold my bitches down, man.*

(Correctional Facility Telephone Transcript ("Tel.Tr.") # 1 dated June 17, 2004, at 5 (emphasis added).)

AR: ... *I was glad my bitches ain't showed up.* My bitches showed up, any one of them.

JJ: It's what? What I had?

AR: Yeah.

JJ: Oh.

AR: *I'd of, I'd of had a heart attack.* 17. . . .

JJ: That's just as good as gone. You know what I mean? 'Til they want to be relived again.

AR: No, no, you hear me?

JJ: What?

AR: *Get rid of them, I'll get new ones.*

JJ: *Completely?*

AR: *Yeah.*

JJ: All right.

(*Id.* at 19–20 (emphases added).) In that conversation, Riley also referred to a "dog" and "cats," by which Johnson surmised he meant his larger and smaller firearms, respectively. (*See* S.Tr. 64–66 (discussing Tel.Tr. # 1, at 20 ("AR: Get rid of the cats. Hold the dog, though, I need the dog.")).)

By the next day, Riley apparently had decided he did not want Johnson to get rid of any of the guns unless necessary:

AR: All right. *Um, hold on to my bitches until I come home.*

JJ: You sure?

AR: Yeah, I'm sure.

JJ: All right.

AR: Not a unless, not unless, it's a need emergency.

(Tel.Tr. # 3 dated June 18, 2004, at 3 (emphasis added).) And on the following day, Riley emphasized that he wanted the guns well concealed.

AR: You put, you put my bitches away, right?

JJ: Yeah.

AR: You can't have them in the house.

JJ: Um.

AR: That's what I mean.

(Tel.Tr. # 4 dated June 19, 2004, at 10.)

When Johnson was questioned by law enforcement agents after Riley's arrest, she initially did not disclose that she had removed and concealed the guns. However, after being questioned at some length by other agents, she eventually, a week after Riley's arrest, revealed the location of Riley's guns. (*See* S.Tr. 61–62.) On June 23, the agents seized the guns from the mobile home in which Johnson had stashed them.

## C. *Riley's Conviction and Sentencing*

Riley was indicted in a three-count superseding indictment ("indictment") charging him with (1) being a previously convicted felon in possession of firearms, to wit, the Remington rifle and the sawed-off M–1 rifle, in violation of 18 U.S.C. § 922(g)(1) (count 1); (2) knowingly possessing the sawed-off, unregistered M–1 rifle, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (count 2); and (3) knowingly making a materially false statement on a matter within the jurisdiction of the DEA, in violation of 18 U.S.C. § 1001 (count 3). A second superseding indictment added a fourth count and a fifth count, to wit, (a) distributing, and (b) conspiring to distribute, cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The second superseding indictment also alleged that at least one of the firearms described in count 1 was possessed in connection with another felony offense and that the sawed-off M–1 rifle was a firearm described in 26 U.S.C. § 5845(a); and it cited Guidelines § 2K2.1, which recommends enhanced punishment for such offense characteristics. Riley promptly entered into a plea agreement with the government. In exchange for the dismissal of counts 2–5, he pleaded guilty to count 1, *i.e.,* being a previously convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

The presentence report ("PSR") prepared by the probation office calculated that under the Guidelines, which the PSR noted were not mandatory in light of *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), Riley had a total offense level of 31 and a criminal history category ("CHC") of VI. The district court, in the exercise of its discretion,

generally adopted the Guidelines calculations at Riley's sentencing hearing.

Riley's base offense level was set at 26 because his offense involved a shortened firearm as described in 26 U.S.C. § 5845(a) and his prior record included convictions for armed robberies and sale of a controlled substance, *see* Guidelines § 2K2.1. For those convictions, Riley had been sentenced to two concurrent one-year terms of imprisonment, of which he served 242 days before being released. Although Riley objected that those convictions were New York State "Youthful Offender Adjudications" with respect to offenses committed when he was 18 years of age and thus should not count, the district court disagreed. The court noted that although New York labeled them "[y]outhful" offender adjudications, they were adult felony convictions within the meaning of the Guidelines, *see* Guidelines § 2K2.1 Application Note 1 ("A conviction for an offense committed at age eighteen years or older is an adult conviction."). The court concluded that, given the nature of Riley's conduct, those crimes should not be discounted as simple youthful indiscretions:

> There's some relevant factors to this particular set of convictions. First, the defendant was in fact not a minor. He was 18 years of age. Second, *the robberies in particular were very violent offenses.* Drugs obviously were of significant drug offense as well [*sic*]. Third, *they resulted in commitment to a prison, to an adult prison for a significant period of time.* In fact, the sentences caused—the sentences called for one year imprisonment.
>
> *Those are extraordinarily serious offenses, in my view, and they're offenses not of a minor but of an adult. An 18 year old adult for sure. But an adult.*
>
> And the Court feels that, based upon, [*United States v.*] *Cuello,* [357 F.3d 162

(2d Cir.), *cert. denied* 543 U.S. 890, 125 S.Ct. 113, 160 L.Ed.2d 152 (2004)] those are supposed to be or should be included. *The Court, in its discretion, includes those in assessing the base offense level and agrees with the recommendation of the probation officer.*

(S.Tr. 120 (emphases added).)

Riley's offense level was increased (a) by two steps as recommended by Guidelines § 2K2.1 (b)(1) because of his possession of three or more firearms (two rifles and a handgun); (b) by four additional steps as recommended by § 2K2.1 (b)(5) because he possessed a firearm in connection with other felony offenses, including narcotics trafficking; and (c) by two steps as recommended by § 3C1.1 for obstruction of justice on account of his instructions to Johnson to remove, conceal, or get rid of his guns in order to allow him to avoid liability for possessing them, see Part II below. After a three-step downward adjustment pursuant to § 3E1.1 for acceptance of responsibility, Riley's total offense level was 31.

Riley's CHC of VI was based on his record of five New York Adjudications. Given an offense level of 31 and a CHC of VI, the Guidelines-recommended imprisonment range was 188–235 months. However, because the statutory maximum prison term for violation of § 922(g)(1) was 120 months, *see* 18 U.S.C. § 924(a)(2), the court sentenced Riley to 120 months' imprisonment. The court also noted that it would have ordered a 120–month prison term even if Riley's two Youthful Offender Adjudications had been excluded from the offense-level calculations. Without consideration of those two offenses, Riley's

> offense level after the application of the three-level reduction for acceptance [of responsibility] would be 25. Criminal history category six. The sentencing range is 110, I believe to 137 months.

And the Court would say that the Court would impose the same sentence as being imposed at this point.

(S.Tr.123.)

Judgment was entered accordingly, and this appeal followed.

## II. DISCUSSION

On appeal, Riley principally challenges (1) the district court's taking into consideration his two youthful offender convictions—for the armed robberies and sale of narcotics committed when he was 18—in the calculation of his offense level and his CHC, and (2) the court's conclusion that he intentionally obstructed justice. We affirm the court's consideration of the robbery and narcotics convictions substantially for the reasons stated by the district court at the sentencing hearing, set out in Part I.C. above. Riley's contention that the inclusion of those convictions in the calculation of his CHC "overstates his history" (Riley brief on appeal at 8) is frivolous and does not warrant discussion. We reject Riley's challenge to the adjustment for obstruction of justice for the reasons that follow.

■ Section 3C1.1 of the Guidelines recommends a two-step increase in offense level

> [i]f (A) *the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation,* prosecution, or sentencing *of the instant offense of conviction,* and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

Guidelines § 3C1.1 (emphases added). Among the types of behavior that can warrant an obstruction-of-justice adjustment are "destroying or concealing or *directing or procuring another person to destroy or conceal evidence* that is material to an official investigation or judicial proceeding." *Id.* § 3C1.1 Application Note 4(d) (emphasis added). Such an adjustment "is appropriate only if 'the defendant had the specific intent to obstruct justice, *i.e.,* . . . the defendant consciously acted with the purpose of obstructing justice.'" *United States v. Reed,* 49 F.3d 895, 900 (2d Cir. 1995) (quoting *United States v. Defeo,* 36 F.3d 272, 276 (2d Cir.1994)).

In reviewing an adjustment for obstruction of justice, we apply the usual standard to the district court's findings of fact. That is, "the sentencing court's findings as to what acts were performed, what was said, what the speaker meant by his words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous." *United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990); *see, e.g., United States v. Ayers,* 416 F.3d 131, 133 (2d Cir.2005). Whether those acts and words constitute obstruction of justice is a matter of legal interpretation that we review *de novo. See, e.g., id.; United States v. Khedr,* 343 F.3d 96, 102 (2d Cir.2003); *United States v. Shoulberg,* 895 F.2d at 884.

■ In the present case, the district court found that Riley intentionally obstructed justice when he instructed Johnson to conceal his guns and to conceal the shortened M–1 in particular:

> Obstruction of justice. There's a series of statements that were made to Miss Johnson. In particular, there was a clear statement that that firearm should not be turned over, in fact hidden, although there was one particular statement later on when he is talking about the dog and the cat, in which this defendant said that you [*sic*] should get rid of a firearm.

Now it is true that that's earlier on in the investigation. *This defendant clearly was aware of previous felony convictions, clearly would be aware that he was not entitled to possess a firearm. There can be no other meaning in that statement to Miss Johnson other than to encourage her to take evidence of a criminal act and hide it.* And as a result, the two-level enhancement for obstruction should be applied.

(S.Tr. 121–22 (emphasis added).) Riley argues that the obstruction adjustment was improper because his statements to Johnson were not made after he was charged with weapons possession, but rather were made at a time when he was being charged only with witness intimidation and giving a false name to law enforcement agents, and that concealment of the guns was unrelated to those pending charges. He further contends that the evidence did not show that he had any intent to obstruct justice, but showed merely either that he "was attempting to avoid *apprehension* for possession of a firearm" or that he "inten[ded] to violate the law by taking possession of the firearms at his first opportunity." (Riley brief on appeal at 11 (emphasis added).) These contentions are meritless.

Addressing them in reverse order, we note first that we see no error, much less clear error, in the district court's finding that Riley intended to obstruct justice. The evidence plainly showed that Riley was aware that a narcotics investigation was ongoing—he had fled to Florida immediately upon learning of the DEA raid on the apartment from which he had been selling drugs—and that he wanted Johnson to keep his firearms away from the authorities. Johnson testified that concealment of the guns had been "pre-discussed before he got locked up" (S.Tr.81) and that Riley had told her to get rid of them "if he was to get locked up" (id. at

95). After Riley was arrested, he repeatedly instructed Johnson to keep his guns away from the authorities, variously telling her to conceal all of them, to dispose of all of them, or to keep one but dispose of the others. And it was entirely permissible for the court to infer that these instructions were given because Riley knew he had a record of felony convictions and was subject to punishment for possession of firearms. As Riley said to Johnson in his first postarrest telephone conversation with her, having determined that she had secured his "bitches," meaning his guns, "I was glad my bitches ain't showed up. My bitches showed up, any one of them," he said, "I'd of had a heart attack." (Tel.Tr. #1, at 19–20.) In sum, we see no basis for overturning the district court's findings that Riley instructed Johnson to conceal or get rid of his guns and that he did so with the intent to obstruct justice.

Second, Riley's contention that his sentence should not have been enhanced for obstruction because his recorded telephone conversations with Johnson occurred at a time when he had been charged only with making a false statement and retaliating against a witness ignores the scope of § 3C1.1 and the district court's findings. The Guidelines recommendation of a sentencing enhancement for obstruction is not limited to obstructions or obstructive attempts that occur during the prosecution of the offense of conviction, but explicitly extends as well to obstructions or attempts that occurred during the "investigation" of that offense. Guidelines § 3C1.1. *See also United States v. Ayers*, 416 F.3d at 134 (even "obstructive conduct which takes place prior to the start of a federal criminal investigation of the particular offense of conviction can warrant an enhancement under § 3C1.1" if that conduct took place in a closely related investigation).

Although the formal prosecution of Riley for weapons possession was not initiated until after Johnson revealed to the authorities where she had hidden the guns, we see no clear error in the district court's finding that Riley's obstruction—both in having Johnson, in accordance with their "pre-discuss[ion]," take the guns away immediately after his arrest, and in procuring her continued concealment of the guns for a week after his arrest—occurred during governmental investigation of his possession of firearms. Although Johnson did not testify precisely how much in advance of his arrest Riley gave her the instruction to get rid of the guns "if he was to get locked up," the record makes it clear that that instruction must have been given during the investigation of Riley for at least drug trafficking. The DEA learned of Riley's drug trafficking as a result of its raid on the Essex apartment in March 2004; immediately after that raid, Riley fled to Florida and did not return until May; and Guy testified that he gave Riley the Remington rifle and shortened the M–1 rifle sometime after March 2004. Thus, when Riley instructed Johnson to get rid of those rifles, he clearly was already under investigation for drug dealing. It required no leap for the court to infer that that investigation encompassed possible weapons possession, for we have taken judicial notice that, to substantial narcotics dealers, guns are "tools of the trade," *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir.2004) (internal quotation marks omitted), *cert. denied*, 544 U.S. 990, 125 S.Ct. 1878, 161 L.Ed.2d 751 (2005); *see, e.g., United States v. Torres*, 901 F.2d 205, 235 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988).

Nor is there error in the finding that Riley's "series of statements ... to Miss Johnson" from jail constituted obstruction within the meaning of § 3C1.1. Riley had been charged with, *inter alia*, retaliation against a witness because DEA agents had learned that he was threatening a CI and other witnesses and was carrying a gun in connection with those threats. It followed logically that their investigation into that retaliation offense would encompass a possible charge of weapons possession.

Accordingly, we see no error in the district court's conclusion that an obstruction-of-justice adjustment was within the scope of § 3C1.1, or in its decision to make that adjustment based either on Riley's prearrest instructions to Johnson to remove and conceal guns that were the tools of the crime for which he was being investigated or on his postarrest instructions to Johnson to continue concealing those weapons.

### CONCLUSION

We have considered all of Riley's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.